ROBBINS GELLER RUDMAN
 & DOWD LLP
DAVID T. WISSBROECKER
EUN JIN LEE
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
dwissbroecker@rgrdlaw.com
elee@rgrdlaw.com

DICKINSON WRIGHT PLLC
ANDREW L. SPARKS
KERRY B. HARVEY
300 W. Vine Street, Suite 1700
Lexington, KY 40507
Telephone: 859/899-8700
844/670-6009 (fax)
asparks@dickenson-wright.com
kharvey@dickensonwright.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| LABORERS' LOCAL #231 PENSION FUND and DANIEL RIORDAN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Civil Action No. 3:18-CV-109-JHM <br><br> COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| PHARMERICA CORPORATION, FRANK E. COLLINS, W. ROBERT DAHL, JR., MARJORIE W. DORR, PATRICK G. LEPORE, GEOFFREY G. MEYERS, ROBERT A. OAKLEY, GREGORY S. WEISHAR, KOHLBERG KRAVIS ROBERTS & CO. L.P. and WALGREENS BOOTS ALLIANCE, INC., | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | DEMAND FOR JURY TRIAL |

- 1 -

Plaintiffs Laborers' Local #231 Pension Fund and Daniel Riordan ("Plaintiffs"), individually and on behalf of all others similarly situated, by the undersigned counsel, respectfully bring this class action for violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, against the herein named defendants and allege the following:

## SUMMARY OF THE ACTION

1.     This is a shareholder class action brought on behalf of the former holders of PharMerica Corporation ("PharMerica" or the "Company") common stock against PharMerica, its board of directors (the "Board"), Kohlberg Kravis Roberts & Co. L.P. ("KKR") and Walgreens Boots Alliance, Inc. ("WBA"), for violations of federal law arising out of false and misleading statements made in connection with the go-private sale of the Company to KKR, with WBA as minority investor, for $29.25 per share in cash representing a deal valued at approximately $1.4 billion ("Merger").

2.     Before the Merger, PharMerica was a publicly traded Fortune 1000 company with approximately $2 billion in annual revenues.  The Company was the second largest institutional pharmacy company in the United States.  As demonstrated by the Company's financial results, SEC filings, press releases and statements by PharMerica management, in the years leading up to the Merger, PharMerica was a prospering company with expectations of strong growth into the future.

3.     PharMerica's growth was expected to be largely fueled by its acquisitions strategy. PharMerica had a long history of successful acquisitions.  The Company had a specific goal of acquiring $100 million in annualized revenues through acquisitions, which the Company achieved in 2015 and 2016.  In February 2017, PharMerica raised the bar: "'for the past or the past several

years we have established and achieved a goal of acquiring $100 million in annual revenues,'" stated defendant Gregory S. Weishar ("Weishar"), PharMerica's Chief Executive Officer ("CEO") and  Board member.  "'For 2017, given a strong acquisition pipeline and pending transactions, we are setting the goal at acquiring annualized revenues of $200 million or more.'"

4.      The Company remained confident about its acquisitions strategy, considering the Company's "strong, "robust," and "compelling" acquisitions pipeline.  In numerous public statements, PharMerica repeatedly represented that it would continue its strategy over the next several years and that it had the ability to continue, even accelerate, this strategy for the foreseeable future.  Moreover, PharMerica repeatedly assured investors that acquisitions would create and return long-term shareholder value.

5.      From at least 2015 to April 2017, defendant Weishar and his management team was able to and did develop reliable financial projections reflecting the Company's acquisitions strategy.  The Company's management developed, used, and updated these financial projections, and provided these projections to outside parties, during this period.

6.      On April 27, 2017, KKR and WBA submitted their Merger offer at $29.25 per share.

7.      Defendant Weishar and his management team knew that the Company's financial projections did not support the $29.25 Merger price.  The Company's financials were improving during this period, so that a valuation on the basis of the financial projections resulted in present-value calculation of the Company's stock surpassing the $29.25 Merger offer.

8.      However, defendant Weishar, his management team – along with the Company's financial advisors UBS Securities LLC ("UBS") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch") – had significant incentives to consummate the Merger.

9.      For Weishar and his management team, the Merger represented an opportunity to obtain post-merger employment and equity-based compensation.   Under these circumstances, Weishar and his management team were incentivized to favor a go-private sale of the Company to KKR at a price not reflecting the Company's acquisitions strategy.   Upon the completion of the Merger, they would be the new owners of the Company's valuable acquisitions strategy, for which they had to pay the Company's shareholders nothing.

10.      For BofA Merrill Lynch, the Merger represented an opportunity to further its pre-existing relationship with KKR and WBA.   In just the two years preceding the Merger, BofA Merrill Lynch earned approximately $74 million in fees from KKR and approximately $49 million in fees from WBA.   To put these numbers in perspective, BofA Merrill Lynch only stood to earn $6 million from PharMerica, contingent upon consummation of the Merger.

11.      BofA Merrill Lynch, in fact, also had an ***ongoing*** relationship with KKR and WBA during the sales process.   As disclosed by BofA Merrill Lynch only at the end of the sales process, a senior member of the BofA Merrill Lynch deal team working on the Merger was contemporaneously: (i) a member of the coverage team for WBA; and (ii) a member of the financial advisory deal teams advising and seeking to advise WBA regarding other acquisition and disposition transactions.   Other members of the BofA Merrill Lynch deal team working on the Merger were individuals who, in fact, had previously pitched their services to KKR (suggesting KKR acquire PharMerica) and to WBA (discussing PharMerica).

12.      For UBS, the Merger also represented an opportunity to further its pre-existing relationship with KKR and WBA.   In just the two years preceding the Merger, UBS earned approximately $125 million in fees from KKR and WBA.   To put this number in perspective, UBS only stood to earn $6 million from PharMerica, contingent upon consummation of the Merger

13.     These conflicts color, if not explain, what happened next.  In April 2017, after the Merger price was on the table, defendant Weishar and his management team began ignoring the Company's complete financial projections and focused on a partial, materially incomplete subset of the projections – a set of financial projections that excluded acquisitions and only reflected an organic growth scenario.  At the same time, the Company continued to complete acquisitions.

14.     The Company's management provided the materially incomplete projections excluding acquisitions to UBS and BofA Merrill Lynch to use in their valuations for the purposes of rendering a fairness opinion.  UBS and BofA Merrill Lynch, despite having been previously provided appropriate, complete financial projections based on the Company's actual growth plan including acquisitions, this time chose to unreasonably rely on management's representation of the "accuracy and completeness" of the projections excluding acquisitions, and unreasonably agreed to assume "that the [projections excluding acquisitions] will be achieved at the times and in the amounts projected."  At the same time, the Company continued to complete acquisitions.

15.     UBS and BofA Merrill Lynch performed their valuations on the incomplete projections, resulting, unsurprisingly, in a range of implied equity values that undervalued the Company's true value – that is, $24.00 to $33.90 per share, or $24.40 - $34.50 per share, respectively.[1]  UBS and BofA Merrill Lynch provided their fairness opinion on these valuations, and on August 1, 2017, relying on the fairness opinions, the Board approved the execution of the Merger Agreement and determined that the Merger was "advisable, fair to and in the best interests" of the Company's stockholders.

---

[1]     Not taking into account present value of federal NOLs.  Taking the present value of federal NOLs resulted in a range of $24.40 - $34.90.

16.     On October 3, 2017, and supplemented on October 27, 2017, defendants filed and disseminated the Definitive Proxy Statement on Schedule 14A, recommending that shareholders accept the $29.25 per share Merger consideration and soliciting shareholder votes (the "Proxy").

17.     In the Proxy, defendants made false statements representing that the Company's actual growth plan at the time of the Merger only contemplated organic growth, not acquisitions growth.  However, as discussed above and in detail below, the  Company's actual growth plan at the time of the Merger contemplated both organic and acquisitions growth, and each defendant was aware of this fact at the time they made these false statements in the Proxy.

18.     In the Proxy, defendants also omitted material information reflecting the acquisitions scenario and/or valuation information reflecting the Company's true growth plan including acquisitions, and information clearly informing stockholders of the flaws in BofA Merrill Lynch's and UBS's valuations and the conflicts faced by BofA Merrill Lynch, UBS, and the Company's management during the period they were leading the Merger negotiations.  Without this information, the Company's stockholders were unable to make an informed decision whether to vote for or against the Merger.  Without this information, the Company's stockholders were induced to defer to BofA Merrill Lynch's and UBS' fairness opinion, and the Board's recommendation based on the fairness opinions, and agreed to give up their ownership of the Company's stock for less-than-fair value.

19.     As such, defendants' violations of §§14(a) and 20(a) of the 1934 Act harmed shareholders by preventing them from casting an informed vote on the Acquisition and ultimately causing them to forfeit their shares for the inadequate merger consideration.  Plaintiffs therefore seek monetary damages to remedy defendants' violations of §§14(a) and 20(a).

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the claims asserted herein pursuant to §27 of the 1934 Act because the claims asserted herein arise under §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

21.     This Court has jurisdiction over each defendant because each defendant was either a corporation that conducts business in and/or maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, most of the relevant documents are electronically stored in this district, and PharMerica's headquarters are located at 1901 Campus Place, Louisville, Kentucky 40299.

## PARTIES

23.     Plaintiffs were, at all relevant times, the owners of PharMerica common stock.

24.     Before the Merger, defendant PharMerica was a Delaware corporation that maintained its headquarters at 1901 Campus Place, Louisville, Kentucky 40299.  Its stock traded on the New York Stock Exchange (the "NYSE") under the symbol "PMC."

25.     Defendant Frank E. Collins ("Collins") was a member of the Board from July 31, 2007 to the closing of the Merger.

26.     Defendant W. Robert Dahl, Jr. ("Dahl") was a member of the Board from July 24, 2008 to the closing of the Merger.  Defendant Dahl's self-proclaimed experience included "expertise in mergers and acquisitions."

27.     Defendant Marjorie W. Dorr ("Dorr") was a member of the Board from January 22, 2009 to the closing of the Merger.

28.     Defendant Patrick G. LePore ("LePore") was a member of the Board from January 14, 2013 to the closing of the Merger.

29.     Defendant Geoffrey G. Meyers ("Meyers") was a member of the Board from November 17, 2009 to the closing of the Merger, and the Chairman of the Board from January 1, 2011 to the closing to of the Merger.  Defendant Meyers' self-proclaimed experience included "strategic planning and development and acquisitions."

30.     Defendant Robert A. Oakley ("Oakley") was a member of the Board from March 24, 2008 to the closing of the Merger.

31.     Defendant Weishar was a member of the Board and the Company's CEO from January 14, 2007 to the close of the Merger.

32.     Defendants Collins, Dahl, Dorr, LePore, Meyers, Oakley, and Weishar are collectively referred to as the "Board" or the "Individual Defendants."

33.     Defendant KKR is a global investment firm.  Its strategy includes identifying undervalued companies, offering the CEO and management team of the target companies post-merger employment and equity-based compensation, and acquiring and taking the target companies private, with the plan to profit through a later liquidation event (*e.g.*, sale or IPO).

34.     Defendant WBA is a global retail pharmacy and health company.  Its portfolio of retail and business brands includes Walgreens, Duane Reade, Boots and Alliance Healthcare, as well as other increasingly global health and beauty product brands.  Its sales totaled $118.2 billion in the fiscal year ended August 31, 2017.

## CLASS ACTION ALLEGATIONS

35.     Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of former holders of PharMerica common stock who were harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are

Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any defendant.

36.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

37.     The Class is so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiffs at this time, but the names and addresses of the Class members can be ascertained from the books and records of PharMerica.  As of the record date, September 28, 2017, there were more than 31.1 million outstanding shares of PharMerica common stock held by hundreds or thousands of individuals and entities scattered throughout the United States.

38.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.   The common questions include, *inter alia*:

(a)     whether defendants violated the federal securities laws as alleged in this Complaint, including violating and/or participating in a scheme to violate §§14(a) and/or 20(a) of the 1934 Act;

(b)     whether defendants made false and misleading statements in the Proxy in violation of §14(a) of the 1934 Act; and

(c)     whether Plaintiffs and the other members of the Class were harmed by the false and misleading statements in the Proxy.

39.     Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interest adverse to the Class.

40.     Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

41.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

42.     Plaintiffs anticipate that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

43.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

**The Company's Business Plan**

44.     Before the Merger, PharMerica was a publicly traded Fortune 1000 company.  With approximately $2 billion in annual revenues, PharMerica was the second largest institutional pharmacy company in the U.S.  The Company purchased, packaged, and dispensed drugs to hospitals, nursing homes, assisted living facilities, and other long-term care settings.   The Company operated 99 institutional pharmacies, 19 specialty infusion centers, and four specialty oncology pharmacies in 45 states.

45.     As stated in the Company's annual report on Form 10-K, filed with the SEC on February 24, 2017,  PharMerica had three fundamental components to its growth plan: (1) driving economies of scale; (2)  growing organically in a market expected to increase with the general aging population of the U.S.; and (3) growing through acquisitions.

46.     As demonstrated by the Company's financial results, SEC filings, press releases and statements by PharMerica management, in the years leading up to the Merger, PharMerica was a prospering company with expectations of strong growth into the future fueled largely by its acquisitions strategy.

**PharMerica Acquisitions Strategy and Growth Expectations**

47.     Since its formation in 2006, the Company has acquired 23 institutional pharmacy businesses, six specialty infusion services businesses, one specialty oncology pharmacy and one hospital services business.

48.     In the Company's annual report filed with the SEC on February 26, 2016, PharMerica described the Company's 3-part growth plan as including acquisitions.  PharMerica stated:

> We also intend to expand our market share through selected geographic expansion in markets not currently served by us and through strategic acquisitions in existing and underserved markets.  The Corporation currently operates in 45 states.  We believe that there are growth opportunities in several other markets.  There are numerous businesses in our markets, mostly small or regional companies that lack the scale that we believe will be necessary to ultimately compete in a market that is national in scope.  We intend to actively seek opportunities to acquire companies.  Since its formation in 2006, the Corporation has acquired 19 institutional pharmacy businesses, four specialty infusion services businesses, one specialty oncology pharmacy and one hospital services business.

49.     The Company also stated:

> We have made and anticipate that we may continue to make acquisitions of, investments in and strategic alliances with complementary businesses to enable us to capitalize on our position in the geographic markets in which we operate and to expand our businesses in new geographic markets.  At any particular time, we may be in various stages of assessment, discussion and negotiation with regard to one or more potential acquisitions, investments or strategic alliances, not all of which, if any, will be consummated.

50.     In the February 26, 2016 press release announcing the Company's fourth quarter and full year 2015 results, defendant Weishar stated: "'During the fourth quarter we completed

two institutional pharmacy acquisitions, one specialty home infusion acquisition and acquired a hospital pharmacy management business.  These acquisitions are consistent with the Company's goal of adding at least $100 million in annualized revenues yearly through acquisitions, which we achieved once again in 2015.'"

51.     Defendant Weishar stated, looking forward to 2016: "'We will look to acquisitions to offset the impact of these headwinds and are once again targeting at least $100 million in annualized pharmacy revenues.'"

52.     Defendant Weishar concluded: "'We continue to focus on organic initiatives and prudent acquisitions aimed at increasing market share and breadth.'"

53.     In the fourth quarter and full year 2015 earnings call, defendant Weishar stated: "We will seek to offset the shortfall in growth and earnings through acquisitions.  However, be assured we will remain disciplined.  We have set an acquisition goal of $100 million in annualized pharmacy revenues for 2016."

54.     He also stated: "Second, we continue to execute on acquisitions over the next several years.  We will see both the market share increase and an increase in overall market strength. We will maintain the goal of closing at least $100 million in annual revenues for the foreseeable future."

55.     He also stated: "Point three, we will continue to add attractive acquisitions and expect greater opportunities for synergies in the non-core business."

56.     David Froesel, the Company's CFO at the time stated: "our acquisition pipeline is strong."

57.     In the proxy statement filed on April 29, 2016 in connection with the Company's annual meeting of stockholders, PharMerica stated that the Company's executive compensation program was structured to focus the Company's executives on "making appropriate acquisitions."

58.     In the May 6, 2016 press release announcing the Company's first quarter 2016 results, defendant Weishar stated: "'We achieved revenue growth both organically and through acquisitions.'"

59.     Defendant Weishar stated: "'In summary, we are off to a good start in 2016, and we will continue to pursue attractive acquisitions that drive share and scale.'"

60.     In the first quarter 2016 earnings call, Weishar stated:

Over the next several years, we will continue to diversify the business, focusing on both organic growth and through acquisitions.

Speaking of acquisitions, we're confident we will continue to execute acquisitions that create a sustainable shareholder value, particularly in the long term care and specialty home infusion businesses.  As we have proven in the past, we will be financially disciplined in pursuing these acquisitions and consistent with prior years, we have set an acquisition goal of $100 million in annualized pharmacy revenues.

61.     Weishar stated: "We will continue to execute on acquisitions over the next several years which will drive both market share and overall market strength.  We will maintain the goal of closing at least $100 million of yearly revenues for the foreseeable future, beyond 2016."

62.     In the August 9, 2016 press release announcing the Company's second quarter 2016 results, defendant Weishar stated: "'Regarding acquisitions, we recently completed the acquisition of Premier Rx, an institutional pharmacy operating in the St. Louis and Kansas City metropolitan areas.  We remain confident we will acquire at least $100 million in annualized revenues before the end of this year.'"

63.     In the second quarter 2016 earnings call, Weishar stated:

We have a robust pipeline of opportunities and are confident we will acquire, once again, over $100 million revenues this year.  These acquisitions create sustainable shareholder value, particularly in the long-term care, especially home infusion businesses where we have meaningful synergies.  As we have proven in the past, we will be financially disciplined pursuing these acquisitions.

64.     Weishar stated:

[T]he M&A piece[,] [w]e are focused on bolt-on acquisitions in the existing markets with regards to institutional and home infusion businesses.  And we're also focused on new markets where we have a couple of places where we would like to fill in.  Most of our acquisitions on the institutional side are bolt-ons, which give us significant synergies, as we consolidate operations, bring our purchasing synergies to the table and our favorable Part D rates to the table.  Similar to the home infusion business, we see the home infusion business, we have synergies on existing markets.  However, we're probably a little more focused on the home infusion side [and] expanding geographically into new markets.

As far as the core specialty or, for instance, oncology business or Hep C specialty business, those kind of core, traditional [or] specialty businesses, we continue to look at that segment.  But at this juncture in our kind of [indiscernible] side lines, see where those businesses end up and continue to grow our oncology businesses as we are doing.

65.     In the November 9, 2016 press release announcing the Company's third quarter 2016 results, defendant Weishar stated that the Company expected "'contributions from recent and planned acquisitions'" in the fourth quarter and "'the full year benefit of acquisitions completed in 2016'" for 2017.

66.     Defendant Weishar stated:

"Regarding acquisitions, we recently completed two acquisitions in the specialty home infusion market, Infusion Resources in Rhode Island and Nextron in New Jersey.  Both of these acquisitions are new markets for us and herald Amerita's expansion into the eastern United States.  In addition, we acquired Regency, an institutional pharmacy operating in southern Texas."

67.     Defendant Weishar concluded: "'We remain confident that the Company's business diversification and growth strategies will support long-term growth in earnings and shareholder value.'"

68.     In the third quarter 2016 earnings call, Weishar stated: "we will benefit from completed and soon-to-be-completed acquisitions."  He stated:

> Before I discuss the preliminary of our 2017, I would like to briefly touch on the Company's plans for acquisitions.  We continue to have a strong acquisition pipeline and are confident we will be able this year to acquire in excess of $100 million in annualized revenues and maintain that level of acquisitions well into the foreseeable future.
>
> These acquisitions create sustainable shareholder value, particularly in long-term care, especially in home infusion businesses, where we have meaningful synergies.
>
> I think all of you have seen that we have maintained discipline over the years, and that won't change.

69.     Weishar stated: "Finally, acquisitions will continue to be a source of growth. PharMerica will complement organic growth by maintaining our goal of acquiring on a yearly basis annualized revenues of at least $100 million."

70.     In the January 31, 2017 press release announcing the appointment of Robert E. Dries ("Dries") as the Company's new CFO, Dries stated: "'PharMerica has achieved impressive growth, and has a compelling acquisition pipeline to continue expanding its institutional and specialty pharmacy businesses.'"

71.     On February 24, 2017, PharMerica issued a press release announcing financial results for the fourth quarter and full year ended December 31, 2016.  Among other things, the Company reported year-over-year increases in quarterly revenue and sequential increases in quarterly revenue, gross profit, net income, diluted earnings per share, adjusted EBITDA, and adjusted earnings per share.

72.     In the Company's annual report filed with the SEC on February 24, 2017, PharMerica stated: "During the year ended December 31, 2016, the Corporation completed acquisitions of four long-term care businesses and two infusion businesses . . . ."

73.     PharMerica also confirmed that its acquisitions strategy was one of the three components of its growth plan:

> We also intend to expand our market share through selected geographic expansion in markets not currently served by us and through strategic acquisitions in existing and underserved markets.  The Corporation currently operates in 45 states.  We believe that there are growth opportunities in several other markets.  There are numerous businesses in our markets, mostly small or regional companies that lack the scale that we believe will be necessary to ultimately compete in a market that is national in scope.  We intend to actively seek opportunities to acquire companies. Since its formation in 2006, the Corporation has acquired 23 institutional pharmacy businesses, six specialty infusion services businesses, one specialty oncology pharmacy and one hospital services business.

74.     The Company also stated:

> We have made and anticipate that we may continue to make acquisitions of, investments in and strategic alliances with complementary businesses to enable us to capitalize on our position in the geographic markets in which we operate and to expand our businesses in new geographic markets.  At any particular time, we may be in various stages of assessment, discussion and negotiation with regard to one or more potential acquisitions, investments or strategic alliances, not all of which, if any, will be consummated.

75.     The Company also stated: "Our growth plans rely, in part, on the successful completion of future acquisitions."

76.     In the February 24, 2017 press release announcing the Company's fourth quarter and full year 2016 results, defendant Weishar stated:

> "The Company delivered strong sequential growth in revenues and earnings for the quarter in both the core Institutional Pharmacy business and Diversified Pharmacy businesses.  In addition, the Company completed two institutional pharmacy acquisitions during the fourth quarter – Express Care and Stanley – which primarily serve the fast growing assisted living facility markets in North Carolina and Virginia.  As we have for the past several years, during 2016 we acquired in excess of $100 million in annualized revenues."

77.     Defendant Weishar also stated:

> "As noted above regarding acquisitions, for the past several years we have established and achieved a goal of acquiring $100 million in annual revenues.  For 2017, given a strong acquisition pipeline and pending transactions, we are setting the goal at acquiring annualized revenues of $200 million or more.  We are targeting

75% of this for the Diversified Pharmacy businesses and 25% for the Institutional Pharmacy business.  Notably, our 2017 guidance includes Adjusted EBITDA of approximately $5 million related to pending acquisitions."

78.     Defendant Weishar added with respect to the Company's business outlook:

"For 2017, the Company's guidance reflects tailwinds from numerous positive developments: first, sequential improvement in Medicare Part D reimbursement based on contracted rates; second, lower cost of goods sold due to successful drug purchasing and cost management efforts in late 2016; third, the full year benefit of acquisitions completed in 2016; and fourth, continued growth in the Diversified Pharmacy businesses."

79.     Defendant Weishar concluded, "'In summary, we are confident in the Company's long-term strategy and expect to *accelerate growth* in 2017.  We remain committed to our business diversification and growth strategies, and to generating superior value for all PharMerica shareholders.'"

80.     During the fourth quarter 2016 earnings call, Weishar stated: "Looking forward to 2017, we expect to accelerate growth due to several factors."  He explained:

- "First, we are launching a new initiative that focuses on growing share in the assisted living segment. As most of you know, the assisted living segment is a rapidly growing alternative for seniors needing support with their activities of daily living."

- "Secondly, we will realize a sequential improvement in Medicare Part D reimbursement, based on previously contracted rates that we have discussed in the past."

- "Third, we have meaningfully lowered the cost of goods sold due to successful drug purchasing and cost management efforts."

- "Fourth, we will realize the full-year benefit of acquisitions we completed in 2016."

- "And fifth, we expect continued stellar growth in the Diversified Pharmacy businesses."

81.     With respect to acquisitions, he stated: "During the quarter, the company completed two institutional pharmacy acquisitions, Express Care and Stanley LTC Pharmacy, primarily serve

the fast growing assisted living facility markets in North Carolina and Virginia.  With these latest acquisitions, we again this year acquired annual revenues in excess of $100 million."

82.   He stated:

Now, let me discuss acquisitions. The acquisition pipeline continues to be strong, and we are actively pursuing deals in both the LTC, the institutional core, and diversified businesses. We've increased the company's 2017 goal to acquiring annualized revenues of $200 million or greater. This is double the $100 million goal we have pursued over the past several years. This year, we are targeting 70% for Diversified Pharmacy businesses and 30% for Institutional Pharmacy businesses. However, given we have several pending transactions, we are currently including approximately $5 million of EBITDA related to 2017 acquisitions and guidance.

We've been disciplined buyers over the years and that won't change.  And we maintain a philosophy of not chasing earnings at the expense of bad acquisitions. And I think you've noticed, we will not overpay in order to get a deal done. To-date, this conservative approach has paid dividends, as we don't have systemic issues that burden the balance sheet and limit financial flexibility. We believe we have the capital structure to support the acquisition program for the foreseeable future.

83.   Defendant Weishar concluded the conference call by stating: "PharMerica is poised to report significantly improved results in 2017, and we are confident that company's business strategies will drive long-term growth in earnings and shareholder value."

84.   In the proxy statement filed on May 1, 2017 in connection with the Company's annual meeting of stockholders, PharMerica stated that the Company's executive compensation program was structured to focus the Company's executives on "making appropriate acquisitions."

85.   On May 10, 2017, PharMerica issued a press release announcing financial results for the first quarter ended March 31, 2017.  Among other things, the Company reported year-over-year and sequential increases in revenue and gross profit.

86.   In the May 10, 2017 press release announcing the Company's first quarter 2017 results, defendant Weishar stated: "'We posted a great first quarter; showing sequential growth in

revenue and gross profit as well as growth in Adjusted EBITDA versus the first quarter of 2016.

We believe we are well positioned to deliver on 2017 financial objectives.'"

87.     With respect to acquisitions, defendant Weishar stated:

"The Company recently completed two acquisitions: CareMed Specialty Pharmacy (CareMed) and Home Care Solutions.   CareMed provides comprehensive specialty pharmacy services on a national basis and Home Care Solutions expands the Company's home infusion business into the large Chicago market.

These acquisitions provide a solid start toward the Company's goal of acquiring $200 million in annualized revenues for the year.

Also, the acquisitions further bolster the progress we are making with respect to the Company's diversification strategy.   We are confident we will achieve, on an annualized run rate, revenues in excess of one billion dollars by the end of the year and are quickly approaching our long-range goal of Diversified Business revenues equaling 50% of total revenues."

88.     Defendant Weishar concluded by reiterating that the Company was on track to meet

its 2017 financial objectives.

89.     In the first quarter 2017 earnings call, Weishar touted the Company's recent results

and was bullish on its prospects:

- "Early results [for the Company's new ValueMed offering] are promising, as we have closed several opportunities and are encouraged with the growth in the sales pipeline."

- "[W]e expected robust growth in the diversified businesses and clearly we saw that in the first quarter of 2017. The diversified businesses grew nearly 35% in the first quarter of 2017 versus the first quarter of 2016. And we are confident, annualized diversified business revenue will exceed $1 billion by the end of this year."

- "We continue to be optimistic when we look at the company's short-term and long-term prospects. This view is driven by the following. First, as we have stated repeatedly, PharMerica has unquestionably the best institutional pharmacy service model in the industry . . . . Secondly, as I mentioned earlier, annualized revenues for the diversified specialty pharmacy businesses will be greater than $1 billion by year end and will represent about 50% of the company's total revenues, on an annualized [basis] by the first quarter of 2019, if not sooner."

90.     With respect to acquisitions, he stated: "Third, the company made six acquisitions in 2016; four long-term care acquisitions and two home infusion acquisitions.  The majority of these transactions occurred in the fourth quarter.  We are on track to realize the full year benefit of these acquisitions by the end of May this year. So this is good news."

91.     He stated:

Looking forward, we continue to support a strong acquisition pipeline and we are actively pursuing deals in both the LTC and diversified businesses.

This year, we're targeting 70% for diversified businesses and 30% for the institutional pharmacy business.  With the CareMed and the Home Care acquisitions closed, we have a good start towards achieving 2017's acquisition goal of $200 million in annualized revenues.  As in the past, as we evaluate acquisitions, we will continue to be disciplined buyers and maintain a philosophy of not chasing earnings at the expense of bad acquisitions.

We believe we have the capital structure to support the current acquisition program for the foreseeable future.

92.     On August 2, 2017, PharMerica issued a press release announcing financial results for the second quarter ended June 30, 2017.  Among other things, the Company reported year-over-year and sequential increases in quarterly revenue, gross profit, net income, diluted earnings per common share, adjusted EBITDA, and adjusted diluted earnings per share.

93.     In the Company's quarterly report filed with the SEC on August 2, 2017, PharMerica stated that the Company completed the acquisitions of "one infusion business and one specialty and oncology business" during the six months ended June 30, 2017.

94.     The Company did not hold an earnings call to discuss its second quarter results due to the announcement of the Merger.

**The Deficient and Conflicted Sales Process**

95.     The Proxy states that in January 2016, on behalf of the Board, UBS and BofA Merrill began discussing a potential acquisition of PharMerica with a small number of financial buyers, including KKR.

96.     Despite the fact that the Company's management, UBS and BofA Merrill were improperly incentivized to sell the Company to KKR (with WBA as a partner) for less than fair value by virtue of the material financial and personal benefits they could obtain through the Merger (discussed further below), the Board failed to protect the sales process from these conflicts, and permitted the Company's management, UBS and BofA Merrill to lead the negotiations leading to the Merger.

97.     BofA Merrill Lynch had a significant previous relationship with KKR and WBA. BofA Merrill Lynch earned fees in a variety of roles for KKR and WBA, including serving as: a financial advisor in connection with certain mergers and acquisitions and divestiture transactions; a bookrunning-manager, underwriter, stabilizing manager, global coordinator and/or initial purchaser for various debt and equity offerings; a dealer for a commercial paper program; a dealer manager for certain debt exchange and tender offers; an administrative agent, bookrunner, collateral agent and/or arranger for, and/or as a lender under, certain term loans, letters of credit, credit and leasing facilities and other credit arrangements; a provider of certain commodity, derivatives, foreign exchange and other trading services; a corporate broker; a provider of certain managed investments services and products; a provider of certain treasury management products and services.   In just the two years preceding the Merger, BofA Merrill Lynch earned ***approximately $74 million*** in fees from KKR and ***approximately $49 million*** in fees from WBA.

98.     To put these numbers in perspective,  BofA Merrill Lynch only stood to earn *$6 million* from PharMerica, contingent upon consummation of the Merger.[2]

99.     BofA Merrill Lynch also had an *ongoing* relationship with KKR and WBA during the sales process.

100.    A senior member of the BofA Merrill Lynch deal team working on the Merger, for example, was contemporaneously: (i) a member of the coverage team for WBA and; (ii) a member of the financial advisory deal teams advising and seeking to advise WBA regarding other acquisition and disposition transactions.

101.    Other members of the BofA Merrill Lynch deal team working on the Merger were individuals who, in fact, had previously pitched their services to KKR (suggesting KKR acquire PharMerica) and to WBA (discussing PharMerica).

102.    With respect to UBS, UBS also had a significant previous relationship with KKR and WBA.  UBS earned fees in a variety of roles for KKR and WBA, including serving as: a provider of financial advisory services; an administrative agent, joint lead arranger and joint lead bookrunner in connection with WBA's $12.8 billion bridge facility commitment for its proposed acquisition of Rite Aid; a joint bookrunner in connection with WBA's issuance of notes in the aggregate principal amount of $6 billion.

103.    In just the two years preceding the Merger, UBS earned *approximately $125 million* in fees from KKR and WBA.

---

[2]     $500,000 was payable upon delivery of its fairness opinion, and the remainder was contingent on the consummation of the Merger.

104.    To put this number in perspective, UBS only stood to earn *$6 million* from PharMerica, contingent upon consummation of the Merger.[3]

105.    With respect to KKR, it is a private equity firm with an acquisitions strategy that includes offering the CEO and management team of the target companies post-merger employment and equity-based compensation, and acquiring and taking the target companies private, with the plan to profit through a later liquidation event (*e.g.*, sale or IPO).

106.    Here, KKR did in fact offer post-merger employment and equity-based compensation to Weishar and his management team.  Under these circumstances, Weishar and his management team were incentivized to favor a go-private sale of the Company to KKR at a price not reflecting the Company's acquisitions strategy.  Upon the completion of the Merger, they would be the new owners of the Company's valuable acquisitions strategy, for which they had to pay the Company's shareholders nothing.

107.    The Proxy does not provide any who, what, when, where details of when post-merger compensation was discussed.  However, the Proxy states that at least as of May 1, 2017, the full Board was apprised that Weishar was engaging in compensation discussions with KKR.

108.    Despite all of the potential and actual conflicts discussed above, the Board failed to protect the sales process on behalf of shareholders.  The Board did not set up an independent Special Committee to guard against improperly incentivized management.  The Board did not hire independent financial advisors who prioritized PharMerica over potential aquirors.

109.    By April 2016, KKR was the only bidder in the picture.

110.    In May 2016, KKR confirmed its intent to partner with WBA.

---

[3]      $500,000 was payable upon delivery of its fairness opinion, and the remainder was contingent on the consummation of the Merger.

111.    On September 14, 2016 KKR and WBA submitted a proposal to acquire PharMerica for $28.75 per share.

112.    As stated in the Proxy, at some point between September 14, 2016 and September 20, 2016, UBS gave price "feedback" to KKR and WBA.

113.    On September 19, 2016, after this "feedback," KKR and WBA verbally indicated an offer at $29.25 per share.

114.    On September 23, 2016, PharMerica entered into an exclusivity agreement with KKR and WBA.

115.    On October 14, 2016, the exclusivity period ended.  The Board did not use this opportunity to reach out to other viable bidders.

116.    From October 2016 through March 2017, KKR and WBA continued their due diligence.

117.    On April 27, 2017, KKR and WBA sent a written offer at the previously proposed $29.25 per share price.

118.    As defendant Weishar and the Company's management were aware, however, the Company's financial projections did not support the $29.25 Merger price.  As discussed above, and confirmed by the summary financial projections disclosed in the Proxy, the Company's financials were improving during this period resulting in revisions upwards to the Company's long-term financial projections:

119.    For instance, the projections for the Company under the organic growth scenario alone reflected increasing expectations of revenue:

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2121 |
|---|---|---|---|---|---|---|---|
| 2015 Projections | 1997.4 | 2234.9 | 2382.9 | 2562.3 | 2761.5 |  |  |
| April 2016 Projections |  | 2188.5 | 2382.9 | 2562.3 | 2761.5 |  |  |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| September 2016 Projections | | 2104.1 | 2356.5 | 2574.2 | 2807.8 | 3052.2 | |
| April 2017 Projections | | | 2439.2 | 2703.1 | 2982.9 | | |
| July 2017 Projections | | | 2439.2 | 2703.1 | 2982.9 | 3265.8 | 3596 |

120.    The Company's financial projections under the full growth scenario (organic + acquisitions) thus implicated even higher values and expectations.

121.    Accordingly, in April 2017, after the Merger price was on the table, defendant Weishar and the Company's management stopped updating the full financial projections under the total growth scenario, and updated *only* the partial financial projections under the organic growth scenario only.

122.    In June 2017, according to the Proxy, BofA Merrill Lynch disclosed for the first time that a senior member of the BofA Merrill Lynch deal team working on the Merger was: (i) a member of the coverage team for WBA; and (ii) a member of the financial advisory deal teams advising and seeking to advise WBA regarding other acquisition and disposition transactions.

123.    BofA Merrill Lynch also belatedly disclosed for the first time that certain members of the BofA Merrill Lynch deal team working on the Merger had previously pitched PharMerica to KKR and discussed PharMerica with WBA.

124.    The Proxy does not provide any information in terms of when BofA Merrill Lynch and UBS fully informed the Board of their previous relationships and compensation from KKR and WBA.

125.    In July 2017, defendant Weishar and the Company's management finalized a set of financial projections that reflected *only* the incomplete organic growth scenario for the specific purposes of providing to BofA Merrill Lynch and UBS to conduct a valuation of the Company in comparison to the $29.25 Merger price (the "July 2017 Projections").

126.    On August 1, 2017, the Board held a meeting.  The Proxy does not state any Board member was absent, thus it can be inferred that each Individual Defendant was present.  Each Individual Defendant was provided the July 2017 Projections.  BofA Merrill Lynch provided each Individual Defendant a DCF valuation based on the July 2017 Projections ($24.40 - $34.50)[4] and UBS provided each Individual Defendant a valuation based on the July 2017 Projections ($24.00 to $33.90 per share).  BofA Merrill Lynch and UBS provided their fairness opinion, their conclusion that the $29.25 Merger price was fair, from a financial point of view, to the Company's stockholders based on their valuations.

127.    Relying on these valuations and fairness opinions, each Individual Defendant determined that the Merger was "fair to and in the best interests" of the Company's stockholders, and approved and authorized the Merger and Merger Agreement.

128.    On August 2, 2017, PharMerica announced the Merger.  In the press release, defendant Weishar stated: "With the support of KKR and a strategic partner in Walgreens Boots Alliance, PharMerica will have additional resources and expertise to advance and grow the business." A representative for KKR confirmed: "KKR and Walgreens Boots Alliance are excited to partner with PharMerica's management and employees to build upon the company's successful foundations and accelerate its future growth."

129.    On August 2, 2017, PharMerica confirmed in disclosed letters to its clients and employees that after the Merger, "PharMerica's leadership and management will remain unchanged."

---

[4]      Not taking into account present value of federal NOLs.  Taking the present value of federal NOLs resulted in a range of $24.40 - $34.90.

**The Proxy Contained Affirmative False and Misleading Statements**

130.   On October 3, 2017, and supplemented on October 27, 2017, defendants disseminated the Proxy.

131.   Defendants made the following statements in the Proxy:

- "the July 2017 Projections were approved by PharMerica for their use for purposes of their financial analyses" (Proxy at 48);

- "None of the [previous projections] were approved by PharMerica for use, or were used, for the purposes of the financial analyses" (*id.*);

- "The following is a summary of the July 2017 Projections that were provided to the board, UBS and BofA Merrill Lynch in connection with their respective consideration of the merger and for use for the purposes of the financial analyses . . . ."

| | Fiscal Year End[1] | | | | |
|---|---|---|---|---|---|
| | 2017E | 2018E | 2019E | 2020E | 2021E |
| | (dollars in millions, except for Adjusted Earnings Per Share) | | | | |
| Revenue | $ 2,439.2 | $ 2,703.1 | $ 2,982.9 | $ 3,265.8 | $ 3,596.0 |
| Gross Profit[2] | $ 769.0 | $ 809.9 | $ 840.7 | $ 872.5 | 905.1 |
| Adjusted EBITDA[3] | $ 142.0 | $ 158.8 | $ 171.8 | $ 182.5 | 193.6 |
| Adjusted Earnings Per Share[4] | $ 1.95 | $ 2.19 | $ 2.40 | $ 2.58 | 2.80 |

(1)   Excludes future acquisitions.

(2)   Gross Profit represents revenue less cost of drugs.

(3)   Adjusted EBITDA does not include non-recurring items of approximately $20 million in fiscal year 2017E and approximately $6 million per year from fiscal years 2018E through 2021E.

(4)   Adjusted Earnings Per Share is defined as net income excluding the impact of intangible amortization and non-recurring expense divided by estimated fully diluted shares.

(*id.* at 50);

- "With respect to the financial forecasts and estimates referred to above, UBS assumed, at the direction of the board, that they were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of PharMerica as to the future financial performance of PharMerica" (*id.* at 36);

- In addition, UBS assumed, with the approval of the board, that the financial forecasts and estimates referred to above will be achieved at the times and in the amounts projected (*id.*);

- "In arriving at its opinion, BofA Merrill Lynch assumed and relied upon, without independent verification, the accuracy and completeness of the

financial and other information and data publicly available or provided to or otherwise reviewed by or discussed with BofA Merrill Lynch and relied upon the assurances of the management of the Company that it was not aware of any facts or circumstances that would make such information or data inaccurate or misleading in any material respect" (*id*. at 43); and

- With respect to the Company management forecasts and the NOLs, BofA Merrill Lynch was advised by the Company, and assumed, that they were reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the management of the Company as to the future financial performance of the Company and the other matters covered thereby" (*id*.).

132. The statements in the above paragraph indicated to a reasonable shareholder that the Company's actual growth plan at the time of the Merger only contemplated organic growth. The Company's previous growth plan was through organic and acquisitions growth. However, the previous projections reflecting the full growth scenario (organic + acquisitions) were explicitly rejected for purposes of assessing the present-value of the Company's expected cash flows in comparison to the Merger consideration. UBS and BofA Merrill Lynch were explicitly instructed to rely only on the projections reflecting only the organic growth scenario in their valuations, and were explicitly instructed that the July Projections were complete, accurate, and "will be achieved at the times and in the amounts projected."

133. It was objectively false that the Company's actual growth plan at the time of the Merger only contemplated organic growth.

134. As demonstrated above in ¶¶47-94 and discussed further below, the Company's actual growth plan at the time of the Merger included acquisitions.

135. The Company had a history of successful acquisitions and acquisitions was a firm component of the Company's three-part growth plan. In the years leading up to the Merger, the Company without exception stated that acquisitions were an integral part of its business plan and a key component of the Company's future prospects.

136.    In numerous public statements, PharMerica repeatedly represented that its acquisitions pipeline was "strong," "robust," and "compelling," and that management had the discipline and expertise to complete acquisitions.  PharMerica's management's compensation was tied to the successful acquisitions.

137.    PharMerica's management had a specific goal of $100 million in revenues from acquisitions, which management upped to "$200 million or more" for 2017 given the Company's success with acquisitions.  PharMerica repeatedly told investors that acquisitions would create shareholder value, especially in the long-term.  PharMerica repeatedly told investors that there were significant acquisitions opportunities in several other markets.

138.    The Company's management was able to and did develop reliable financial projections reflecting their acquisitions strategy.  As confirmed by the summary financial projections disclosed in the Proxy, the Company's management developed, used, and updated financial projections reflecting the Company's complete growth plan (organic + acquisitions) from 2015 to April 2017 (*i.e.*, until the Merger offer was on the table).

139.    The Company's management provided the financial projections reflecting the Company's complete growth plan (organic + acquisitions) to each Individual Defendant, UBS, BofA Merrill Lynch, KKR, UBS and other bidders.  The July 2017 Projections were provided to each Individual Defendant, UBS, BofA Merrill Lynch.  The Proxy does not indicate, so it is reasonable to infer, that the July 2017 Projections were provided to KKR or UBS.

140.    The Company continued to make acquisitions in the years preceding the Merger. For instance, in April 2017 – when, with the Merger offer on the table, the Company's management stopped updating the financial projections reflecting the Company's complete growth plan and began updating only the partial financial projections reflecting just the organic growth scenario –

the Company's management updated the no-acquisitions projections to reflect two recent acquisitions – *i.e.*, "to reflect the expected impact of PharMerica's acquisition of CareMed Specialty Pharmacy."

141.   PharMerica had no plans to abandon its acquisitions strategy at the time PharMerica prepared the July 2017 Projections.   In numerous public statements, PharMerica repeatedly represented that it would continue its strategy over the next several years and that it had the ability to continue, even accelerate, this strategy for the foreseeable future.

142.   Moreover, as indicated by the statements by PharMerica management and KKR, KKR had no plans to change PharMerica's growth strategy and expected to continue that strategy, including acquisitions, on an accelerated timetable.

143.   It was also subjectively false that the Company's actual growth plan at the time of the Merger only contemplated organic growth.

144.   As demonstrated above in ¶¶47-147 and discussed further below, each Individual Defendant knew that the Company's actual growth plan included acquisitions at the time they made the statements identified in ¶131 in the Proxy.

145.   With respect to defendant Weishar, he:

- repeatedly made public statements in SEC filings, press releases, and earnings calls that the Company's acquisitions were an essential component of the Company's growth plan, that the Company had a strong pipeline, that the Company could meet and exceed its $200 million in revenues goal for acquisitions that the Company intended to complete successful acquisitions for the next several years;

- prepared the Company's financial projections reflecting the Company's full growth plan, including acquisitions;

- presented the Company's financial projections reflecting the Company's full growth plan to the Board, bankers, and potential bidders without indicating that these projections were unreliable, unreasonable or too optimistic;

- after receiving the Merger offer, prepared the July 2017 Projections, excluding acquisitions;

- instructed UBS and BofA Merrill Lynch to rely on the July 2017 Projections only for the purposes of their fairness opinion;

- instructed UBS and BofA Merrill Lynch to assume that the July 2017 Projections were complete, accurate, and "will be achieved at the times and in the amounts projected"; and

- negotiated and obtained post-merger employment and post-merger equity compensation from KKR and WBA.

146.   With respect to each remaining member of the Board, he/she:

- was presented with the Company's financial projections reflecting the Company's full growth plan, including acquisitions on numerous occasions between 2015 to April 2017;

- discussed the Company's "standalone plan" which included a growth-through-acquisitions in numerous Board meetings, including on March 18, 2016, June 6, 2016, July 1, 2016, October 14, 2016, March 24, 2017, and May 1, 2017;

- was presented with updates to the Company's financial projections reflecting improving performance;

- after receiving the Merger offer, was presented with the June 2017 Projections, excluding acquisitions;

- was specifically informed that these projections were the basis for UBS and BofA Merrill Lynch's valuations and fairness opinions; and

- relied on UBS and BofA Merrill Lynch's valuations and fairness opinions in approving the Merger.

147.   Each Individual Defendant had the opportunity to review and edit the statements in the Proxy. Each Individual Statement approved and were responsible for the statements in the Proxy.

**The Proxy Contained Misleading Omissions**

148.   In the Proxy, defendants omitted the following information:

- the Company's financial projections reflecting the acquisitions scenario and/or valuation information reflecting the Company's true growth plan including acquisitions;

- statements clearly informing stockholders that the UBS's and BofA Merrill Lynch's valuation was performed on projections that ignored a critical growth plan and expectations of the Company;

- statements clearly informing stockholders the who/what/when/where of compensation discussions between management and KKR and/or WBA; and

- statements clearly informing stockholders when the Board was informed of which specific components of the UBS' and BofA Merrill Lynch's relationships with KKR and/or WBA.

149.    A reasonable shareholder would consider the above information important in deciding whether to vote in favor of the Merger.  For instance, stockholders would want to know the acquisitions value they were not being paid for.  Stockholders would want to know this value, especially where this value was going to be owned, and eventually monetized, by KKR, WBA and the Company's management.

150.    Stockholders would also want to know that UBS's and BofA Merrill Lynch's valuation underestimated the present-value of the Company's stock because the valuations omitted a critical component of the Company's true growth plan.  Stockholders would want to be explicitly informed of this flaw in UBS's and BofA Merrill Lynch's valuations where: (i) stockholders were being encouraged to defer to UBS's and BofA Merrill Lynch's fairness opinion and give up their stock for the Merger price; and (ii) the valuations were presented in a Proxy containing numerous statements suggesting the validity of the June 2017 Projections, including the statement that the numbers in the projections "will be achieved at the times and in the amounts projected."

151.    Shareholders would also want to know the scope and timing of the conflicts. Stockholders would want to know this information because conflicted individuals were specifically in charge of the sales process, and the Proxy touted the Merger as in the Company's stockholders "best interests."

152.   The omitted information identified in ¶148 above, rendered the following statements in the Proxy misleading:

- statements representing that the Merger and $29.25 price was "fair to" and "in the best interests of" PharMerica's stockholders  (*see* Proxy at 4, 19, 31, 34-35);

- statement representing that the $29.25 price was "more favorable" than the "likely value that might result from other potential transactions or remaining a standalone company" (*see id.* at 32);

- statement representing that the Board determined $29.25 price was more favorable than the Company's future prospects, considering the Company's future prospects, including financial projections, continuing as a standalone company, including engaging in acquisitions (*id.*);

- statement representing that UBS's and BofA Merrill Lynch's valuations and fairness opinions supported defendants' position (*see id.* at 32);

- the summary of UBS's and BofA Merrill Lynch's DCF valuations resulting respectively in a range of implied equity values of $24.00 to $33.90 per share, or $24.40 - $34.50 per share,[5] and each concluding that the $29.25 Merger price was fair, from a financial point of view, to the Company's stockholders  (*see id.* at 39, 45);

- the representation that the Board considered "the interests of the Company's directors and executive officers in the merger" before approving the Merger (*see id.* at 34); and

- the representation that the Board received information regarding UBS's and BofA Merrill Lynch's relationships with KKR and WBA (*see id.* at 30) (indicating that Board received "BofA Merrill Lynch disclosure memorandum, dated September 6, 2015, April 24, 2016, July 7, 2016 and April 28, 2017, and related email disclosure dated December 14, 2015" and the final version "dated July 20, 2017") (indicating that the Board received "the final version of the UBS material relationships disclosure memorandum on July 31, 2017" and "[p]revious versions of the UBS disclosure memorandum were delivered to the board on August 26, 2015 and February 1, 2017, and a preliminary disclosure memorandum was delivered on November 24, 2015").

---

[5]   Not taking into account present value of federal NOLs.  Taking the present value of federal NOLs resulted in a range of $24.40 - $34.90.

153.    The omitted information identified in ¶148 rendered the statements in the above paragraph misleading because the omitted information materially contradicted the explicit and implicit representations that shareholders would understand from the statements in the above paragraph.

154.    For instance, stockholders would assume from the statements identified in ¶152 that defendants were recommending the Merger based on valid valuations based on the Company's actual growth plan.  As alleged herein, this simply was not true, and the omitted information identified in ¶148 was necessary to reveal the complete truth as to the value of the Company's stock to the Company's stockholders.

155.    In addition, stockholders would assume from the statements identified in ¶152 that defendants were recommending the Merger after conducting a thorough review and check of conflict.  As alleged herein, this was also not true, and the omitted information identified in ¶148 was necessary to reveal the complete picture of conflict to the Company's stockholders.

156.    The Proxy was a formal document filed with the SEC in connection with a cash-out merger and set forth the recommendation of each Individual Defendant in favor of the Acquisition and the purported reasons why each Individual Defendant believed that the Acquisition and the Acquisition price was fair and in the best interest of PharMerica's stockholders.

157.    Each Individual Defendant was a member of the Board when the Proxy was disseminated and had the power to influence and control and ***did*** influence and control, directly or indirectly, the content and dissemination of the Proxy.  The Proxy contained the unanimous recommendation of each of the Individual Defendants to approve the Acquisition.  Each Individual Defendant was thus directly involved in and responsible for the statements in the Proxy.

158.    The Proxy was an essential link in the accomplishment of the Merger. As detailed above, the Company's stockholders were precluded from making a fully informed decision in connection with a Merger and the Merger consideration was inadequate for omitting a valuable component of the Company's growth plan.

159.    The false and misleading Proxy had the intended effect: a materially misinformed vote of the PharMerica's shareholders, who voted in favor of the Merger on November 9, 2017.

160.    On December 7, 2017, defendants completed the Merger.

## COUNT I

**For Violations of §14(a) of the 1934 Act and Rule 14a-9**
**Promulgated Thereunder Against PharMerica and the Individual Defendants**

161.    Plaintiffs repeat and reallege each allegation set forth herein.

162.    The Proxy was prepared, reviewed and/or disseminated by PharMerica and each Individual Defendant.

163.    By virtue of their positions as officers and/or directors of PharMerica and participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

164.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

165.     The Individual Defendants were each involved in negotiating, reviewing and approving the Acquisition.  The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions which had input from the Individual Defendants.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Acquisition.

166.     The Proxy contained materially false statements and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

167.     PharMerica and the Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

168.     As a direct result of defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy, Plaintiffs and the Class were induced to vote their shares and accept the inadequate Merger consideration in connection with the Acquisition.

169.     The false and/or misleading Proxy used to obtain shareholder approval of the Acquisition deprived Plaintiffs and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their PharMerica shares.

170.     At all times relevant to the dissemination of the materially false and/or misleading Proxy, defendants were aware of and/or had access to the true facts concerning PharMerica's true value, which was far greater than the Merger consideration PharMerica's stockholders received.

171.     Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy defendants used to obtain shareholder approval of and thereby consummate the Acquisition, Plaintiffs and the Class have suffered damage and actual economic losses (*i.e.*, the

difference between the price PharMerica shareholders received in the Merger and PharMerica's true value at the time of the Merger) in an amount to be determined at trial.

172.    The false and misleading statements in the Proxy were material in that a reasonable shareholder would consider them important in deciding how to vote on an acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in a proxy and in other information reasonably available to shareholders.  The false and misleading Proxy had the intended effect: a materially misinformed vote of the PharMerica shareholders, who voted in favor of the Acquisition on November 9, 2017.

173.    By reason of the foregoing, PharMerica and the Individual Defendants have violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

174.    Because of the false and misleading statements in the Proxy, Plaintiffs and the members of the Class were harmed.

## COUNT II

**For Violation of §20(a) of the 1934 Act**
**Against the Individual Defendants, KKR and WBA**

175.    Plaintiffs repeat and reallege each allegation set forth herein.

176.    The Individual Defendants acted as controlling persons of PharMerica within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of PharMerica and their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy and Proxy Supplement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

177.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy contained the unanimous recommendation of each of the Individual Defendants to approve the Acquisition.  The Individual Defendants were thus directly involved in the making of this document.

178.    KKR and WBA acted as controlling persons of PharMerica and the Individual Defendants within the meaning of §20(a) of the 1934 Act as alleged herein.  Pursuant to the Merger Agreement, KKR and WBA possessed control over PharMerica and the Individual Defendants.

179.    In particular, KKR and WBA had direct supervisory control over PharMerica, pursuant to the Merger Agreement, as each was able to restrict the conduct of PharMerica's business prior to the consummation of the Acquisition.  Moreover, KKR and WBA had control over the preparation and dissemination of the Proxy, including the composition of each document and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.

180.    Each of the Individual Defendants, KKR and WBA was provided with or had unlimited access to copies of the Proxy prior to and/or shortly after these documents were issued and therefore had the ability to prevent the issuance of the false and misleading statements contained therein or cause the statements to be corrected.

181.    In addition, as the Proxy sets forth, the Individual Defendants, KKR and WBA were each involved in negotiating, reviewing and/or approving the Merger.  The Proxy describes the various issues and information that they reviewed and considered, and these descriptions had input from the Individual Defendants, KKR and WBA.

182.    By virtue of the foregoing, the Individual Defendants, KKR and WBA have violated §20(a) of the 1934 Act.  The Individual Defendants, KKR and WBA had the ability to exercise control over and did control a person or persons who each violated §14(a) and SEC Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants, KKR and WBA are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of these defendants' conduct, Plaintiffs and all other Class members were harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment, in Plaintiffs' favor and in favor of the Class and against defendants, as follows:

A.    Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class representative and Plaintiffs' counsel as Class counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  February 24, 2018                    DICKINSON WRIGHT PLLC

*/s/ Andrew L. Sparks*

KERRY B. HARVEY
ANDREW L. SPARKS
300 W. Vine Street, Suite 1700
Lexington, KY 40507
Telephone: 859/899-8700
844/670-6009 (fax)

ROBBINS GELLER RUDMAN
 & DOWD LLP
DAVID T. WISSBROECKER
EUN JIN LEE
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

CAVANAGH & O'HARA
PATRICK J. O'HARA
2319 West Jefferson Street
Springfield, IL 62702
Telephone: 217/544-1771
217/544-9894 (fax)

JOHNSON FISTEL, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY 10016
Telephone: 212/802-1486
212/602-1592 (fax)

Attorneys for Plaintiffs