# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

LABORERS' LOCAL #231 PENSION FUND
and DANIEL RIORDAN, Individually and on
Behalf of All Others Similarly Situated,                           Plaintiffs


v.                                                    Civil Action No. 3:18-CV-109-RGJ

PHARMERICA CORPORATION, FRANK E.
COLLINS, W. ROBERT DAHL, JR.,
MARJORIE W. DORR, PATRICK G.
LEPORE, GEOFFREY G. MEYERS, ROBERT
A. OAKLEY, GREGORY S. WEISHAR,
KOHLBERG KRAVIS ROBERTS & CO. L.P.
and WALGREENS BOOTS ALLIANCE, INC.,                              Defendants

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on two motions to dismiss. The first is filed by PharMerica

Corporation and Kohlberg Kravis Roberts & Co. L.P. [DE 55]. The second is filed by

PharMerica's Board of Directors, Frank E. Collins, W. Robert Dahl, Jr, Marjorie W. Dorr, Patrick

G. Lepore, Geoffrey G. Meyers, Robert A. Oakley, Gregory S. Weishar (collectively, the "Board

of Directors"). [DE 56]. Plaintiffs, Laborer's Local #231 Pension Fund and Daniel Riordan, on

behalf of himself and those similarly situation, responded and request oral argument. [DE 59].

These issues have been extensively briefed. Thus, the Court finds oral argument unnecessary.

Plaintiffs' request for oral argument is **DENIED**, and for the reasons below, both motions to

dismiss, [DE 55, 56], are **GRANTED**.

## I.  BACKGROUND

Plaintiffs, Laborer's Local #231 Pension Fund and Daniel Riordan, were both shareholders

of the PharMerica Corporation ("PharMerica" or the "Company") before affiliates of Kohlberg

Kravis Roberts & Co. L.P. ("KKR") and Walgreen Boots Alliance, Inc. ("Walgreens") acquired the Company through a cash-out merger. [DE 1, Complaint at 1, ¶1; 7, ¶23]. Plaintiffs bring this putative class action lawsuit, against PharMerica and its Board of Directors, KKR, and Walgreens, under the Securities Exchange Act Section 14(a) and SEC Rule 14a-9 promulgated thereunder alleging that the Proxy Statement (the "Proxy") contained both affirmative material misleading statements and material omissions. [*Id.* at 35–37]. Plaintiffs also seek to hold PharMerica's Board of Directors, KKR, and Walgreens, liable as control persons under the Securities Exchange Act Section 20(a). [*Id.* at 37–39].

A. PharMerica's Acquisitional Growth

PharMerica was a publicly traded Fortune 1000 company. [*Id.* at 10, ¶44]. It was the second largest institutional pharmacy company in the United States. [*Id.*] PharMerica's headquarters was in Louisville, Kentucky. [*Id.* at 7, ¶24]. PharMerica had a three-part growth plan. [*Id.* at 28, ¶135]. One of those parts was growth through acquisitions. [*Id.*]. PharMerica had successfully grown through acquisition before the merger and made many public statements about its intent to continue to grow in this way, including in its SEC filings. [*Id.* 10–20].

B. Bank of America Merrill Lynch ("BAML") and UBS Securities LLC ("UBS") Facilitate PharMerica's Merger with KKR and Walgreens

PharMerica engaged BAML and UBS to explore potential business combinations and act as financial advisors. [*Id.* at 21, ¶95]. In January 2016, BAML and UBS began discussing with KKR and Walgreens the potential acquisition of PharMerica. [*Id.*]. Both BAML and UBS had previous relationships with KKR and Walgreens. [*Id.* at 21–23]. BAML earned roughly $74 million in fees from KKR and roughly $49 million in fees from Walgreens in the two years before the merger. [*Id.* at 21, ¶97]. Similarly, UBS earned roughly $125 million in fees from KKR and Walgreens in the two years before the merger. [*Id.* at 22, ¶103]. Both BAML and USB stood to

earn far less money from the merger than the money they had earned from their relationships with KKR and Walgreens. [*Id*. at 22, ¶98; 23, ¶104].

Along with their previous relationship, BAML also had an ongoing relationship with KKR and Walgreens during the merger. [*Id*. at 22, ¶99]. For example, a senior member of the BAML team working on the merger was also a member of the coverage team for Walgreens and a member of the financial advisory team advising Walgreens on other acquisitions. [*Id*. at 22, ¶100].

On September 14, 2016, KKR and Walgreens submitted a tentative proposal to purchase PharMerica in a cash-out merger for $28.75 per share. [*Id*. at 24, ¶111]. Upon, receiving price feedback from UBS, KKR, and Walgreens orally increased their price to $29.25 per share on September 19, 2016. [*Id*. at 24, ¶¶112-13]. On April 27, 2017, KKR and Walgreens formalized the $29.25 per share offer. [*Id*. at 24, ¶117].

Throughout the sales process PharMerica's management periodically prepared financial forecasts for the Company (the "Projections"). [*Id.* at 29, ¶138]. Projections were created in 2015, April 2016, September 2016, April 2017, and July 2017. [*Id.* at 24, ¶119]. The Projections— except the July 2017 Projections—contained two scenarios: one scenario assumed future acquisitions, and one scenario assumed no future acquisitions. [*Id*.]. The July 2017 Projections, however, contained only the scenario assuming no future acquisitions. [*Id*.; *Id.* at 25, ¶125]. The July 2017 Projections included a footnote stating that they excluded acquisitions. [*Id*. at 27, ¶131].

On August 1, 2017, PharMerica's Board of Directors met with UBS and BAML to review the formal offer from KKR and Walgreens. [*Id.* at 26, ¶126]. While PharMerica included all five sets of projections in its Proxy statement, the Company only approved the July 2017 Projections for UBS and BAML to use for their fairness opinions. [*Id.* at 28, ¶132]. Based on the July 2017 Projections and other provided information, BAML and UBS issued fairness opinions, which

stated that the $29.25 per share price was fair from a financial standpoint. [*Id.* at 26, ¶126]. Relying in part upon these fairness opinions, the Directors determined that the merger was "fair to and in the best interests" of the Company's stockholders and voted to approve the merger and executed the Merger Agreement. [*Id.* at 26, ¶127].

C. The Proxy

On October 3, 2017, Defendants published the Proxy. [*Id.* at 27, ¶130]. Two lawsuits were filed, one of which alleged that "the Preliminary Proxy did not disclose sufficient information relating to (i) PharMerica's financial projections, (ii) the analysis underlying UBS's and BAML's fairness opinions, and (iii) the potential conflicts of interest of PharMerica's management" and another that "added allegations related to UBS's potential conflicts of interest." [DE 55, Def. Mot. to Dismiss, at 381]. On October 27, 2017, Defendants supplemented the Proxy. [*Id.* at 384]. After the additional disclosures, plaintiffs in the two lawsuits dismissed the suits. [*Id.*]. The approximately 100-page Proxy recommends that shareholders vote for adopting the Merger Agreement and states that the contemplated merger is "fair to and in the best interests of the Company and its Shareholders." [DE 55-2, Proxy Statement, at 408]. The Proxy also states that the $29.25 per share price is fair to and in the best interest of PharMerica stockholders. [*Id.* at 444–45].

1. The Projections

The Proxy contains summaries of all five sets of projections. [*Id.* at 462–63]. It also discloses that the July 2017 Projections excluded acquisitions. [*Id.* at 463]. The Proxy also states that the financial advisors relied on the July 2017 Projections in their evaluation of the merger and the formation of their fairness opinions. [*Id.*]. Finally, the Proxy contains a long disclaimer stating

that stockholders should not rely on the Projections as suggesting the occurrence of future events, and that the Projections may not be accurate.  [*Id.* at 461].

    *2.   Conflicts of Interest*

The Proxy disclosed information about each financial advisor's relationship with KKR and Walgreens and stated that those relationships were disclosed to the PharMerica Board of Directors before voting on the merger.  [*Id.* at 454, 459–60].  The Proxy disclosed that UBS had provided services to, and received compensation from, Walgreens and KKR, respectively, on other matters and occasions, including multi-billion-dollar transactions.  [*Id.* at 454].  The Proxy also stated that UBS collected $125 million in fees from KKR and Walgreens combined in roughly the past two years.  [*Id.*].  Similarly, the Proxy stated that BAML had collected about $74 million from KKR and $49 million from Walgreens in fees over the past two years.  [*Id.* at 460].  The Proxy also disclosed that members of the BAML team advising PharMerica had also worked for or sought to work for KKR and Walgreens.  [*Id.* at 443].  Finally, the Proxy states that, with the aid of its outside counsel, the PharMerica Board of Directors specifically evaluated UBS's and BAML's potential conflicts of interest and determined that those potential conflicts would not prevent BAML and UBS from properly advising PharMerica about the merger.  [*Id.* at 437–38, 445].

Along with disclosing the potential conflicts described above, the Proxy also disclosed that during the merger process, KKR and Walgreens had discussions with PharMerica's executive officers.  [*Id.* at 472].  The Proxy states that those discussions involved post-merger employment and retention agreements.  [*Id.*].  The Proxy also states that these discussions were disclosed to the Board prior to the Board's approval of the merger.  [*Id.* at 443].

### 3. The SEC Filings

The Proxy incorporates by reference PharMerica's SEC filings, including PharMerica's 10-K filed on February 24, 2017 and PharMerica's 10-Q filed on August 2, 2017. [*Id.* at 510]. The Proxy provided the stockholders with instructions on how to access these documents. [*Id.*]. The 2017 10-K states that PharMerica's growth plan includes acquisitional growth. [DE 55-6, 2017 10-K, at 781, 808].

## II. STANDARD

In considering a motion to dismiss, the Court must accept as true all factual allegations set forth in the complaint and make all reasonable inferences in favor of the non-moving party. *Davis v. Prison Health Servs.*, 679 F.3d 433, 440 (6th Cir. 2012). To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A complaint will be dismissed "if no law supports the claim made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief." *Southfield Educ. Ass'n v. Southfield Bd. of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561–64).

Claims alleging that misleading statements have violated securities laws are subjected to a heightened pleading standard under the Private Securities Litigation Reform Act (the "PSLRA"). 15 U.S.C. § 78u-4(b)(1); *see Kugelman v. PVF Capital Corp.*, 972 F. Supp. 2d 993, 999 (N.D.

Ohio 2013). Such complaints "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C.A. § 78u-4(b)(1). The purpose of this heightened pleading standard is "to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322, (2007).

## III. DISCUSSION

PharMerica and KKR, move to dismiss the claims against them, arguing that Plaintiffs' Section 14(a) claims should be dismissed for three reasons. First, Plaintiffs fail to identify a materially false or misleading statement or omission contained in or left out of the Proxy. [DE 55 at 388–96]. Second, Plaintiffs fails to allege scienter. [*Id.* at 396–98]. Third, Plaintiffs fail to sufficiently plead loss causation. [*Id.* at 398–99]. Arguing that there is no underlying Section 14(a) violation and that Plaintiffs fail to allege adequate control, KKR and also move to dismiss Plaintiffs' Section 20(a) claims. [*Id.* at 399–401].

The Individual Defendants filed a separate motion to dismiss in which they incorporate by reference PharMerica's and KKR's arguments described above, [DE 56 at 1215] and offered additional arguments on scienter [*id.* at 1216–19] and control person liability [*id.* at 1219–22]. As the Section 20(a) claims depend on the Section 14(a) claims, the Court will start with Section 14(a).

### A. Plaintiffs' Section 14(a) Claim

The Securities Exchange Act Section 14(a) grants the SEC power to promulgate rules and regulations for soliciting proxies with respect to any registered security. 15 U.S.C. § 78n(a). It

also makes it unlawful to solicit any proxy in contravention of those rules and regulations. *Id.* "The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation," and provides a private right of action. *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964). SEC Rule 14a-9 prohibits soliciting a proxy through materially false or misleading statements or omissions. 17 C.F.R. § 240.14a-9. A Section 14(a) claim for an SEC Rule 14a-9 violation has four basic elements: (i) the proxy statement contains a material misrepresentation or omission; (ii) defendants were at least negligent;[1] (iii) the misrepresentations or omissions caused plaintiffs alleged loss; and (iv) the proxy statement was an essential link in the completion of the transaction. *Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 868 (S.D. Ohio 2013) (quoting *Lane v. Page*, 727 F. Supp. 2d 1214, 1227–28 (D.N.M. 2010)).

A misrepresentation or omission is material when there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). In other words, the fact at issue must significantly alter the "total mix" of information in the proxy statement. *Id.* Whether a statement is misleading is determined objectively from a reasonable stockholder's perspective. *Id.* at 445.

Along with factual statements, opinions in proxy statements can also constitute material misrepresentation. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991). Here, the opinion must be both subjectively and objectively false so that the opinion is wrong, and the defendant knew it to be so. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) (citing *Va. Bankshares*, 501 U.S. at 1093).

---

[1] The parties dispute whether scienter or negligence is required. The Court addresses the issue below.

The Private Securities Litigation Reform Act ("PSLRA") requires Section 14(a) claims to allege loss causation. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 165 (2008) (holding that the PSLRA imposes a loss causation requirement upon any private right of action brought under the Securities Exchange Act); *Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000) (finding loss causation a requisite of a properly plead claim pursuant § 14(a) of the 1934 Act and SEC Rule 14a-9). Loss causation consists of both economic loss and proximate causation—plaintiff must allege both. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). In Section 14(a) claims, to plead loss causation plaintiffs must tie the misleading proxy statements directly to the economic harm suffered by plaintiff. *In re Hot Topic Sec. Litig.*, No. CV 13-02939 SJO (JCx), 2014 WL 7499375, at *11 (C.D. Cal. May 2, 2014); *Grace*, 228 F.3d at 46.

1. *Affirmative False and Misleading Statements*

In evaluating whether a Proxy Statement contains a materially false or misleading statement under Section 14(a), the court is not concerned with the details or actual fairness of the merger. If Plaintiffs have concerns with the share price, the appropriate remedy would have been to exercise their appraisal rights. As a result, the Court here looks not to whether the $29.95 per share price and the fairness opinions endorsing that price, both of which were based on the July 2017 Projections, are literally fair, but whether the Proxy made any misstatements or omitted information necessary for a stockholder to evaluate the Proxy and the merger causing the Proxy to be false or misleading.

Plaintiffs allege these seven statements in Defendants' Proxy Statement, when read together, cause the Proxy to be false and misleading:

- the July 2017 Projections were approved by PharMerica for their use for purposes of their financial analyses;

- None of the [previous projections] were approved by PharMerica for use, or were used, for the purposes of the financial analyses;

- The following is a summary of the July 2017 Projections that were provided to the board, UBS and BofA Merrill Lynch in connection with their respective consideration of the merger and for use for the purposes of the financial analyses . . . .

|  | Fiscal Year End[1] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 2017E | | 2018E | | 2019E | | 2020E | | 2021E | |
|  | (dollars in millions, except for Adjusted Earnings Per Share) | | | | | | | | | |
| Revenue | $ | 2,439.2 | $ | 2,703.1 | $ | 2,982.9 | $ | 3,265.8 | $ | 3,596.0 |
| Gross Profit[2] | $ | 769.0 | $ | 809.9 | $ | 840.7 | $ | 872.5 | $ | 905.1 |
| Adjusted EBITDA[3] | $ | 142.0 | $ | 158.8 | $ | 171.8 | $ | 182.5 | $ | 193.6 |
| Adjusted Earnings Per Share[4] | $ | 1.95 | $ | 2.19 | $ | 2.40 | $ | 2.58 | $ | 2.80 |

_____

(1) Excludes future acquisitions.

(2) Gross Profit represents revenue less cost of drugs.

(3) Adjusted EBITDA does not include non-recurring items of approximately $20 million in fiscal year 2017E and approximately $6 million per year from fiscal years 2018E through 2021E.

(4) Adjusted Earnings Per Share is defined as net income excluding the impact of intangible amortization and non-recurring expense divided by estimated fully diluted shares.

- With respect to the financial forecasts and estimates referred to above, UBS assumed, at the direction of the board, that they were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of PharMerica as to the future financial performance of PharMerica;

- In addition, UBS assumed, with the approval of the board, that the financial forecasts and estimates referred to above will be achieved at the times and in the amounts projected;

- In arriving at its opinion, BofA Merrill Lynch assumed and relied upon, without independent verification, the accuracy and completeness of the financial and other information and data publicly available or provided to or otherwise reviewed by or discussed with BofA Merrill Lynch and relied upon the assurances of the management of the Company that it was not aware of any facts or circumstances that would make this information or data inaccurate or misleading in any material respect; and

- With respect to the Company management forecasts and the NOLs, BofA Merrill Lynch was advised by the Company, and assumed, that they were reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the

management of the Company as to the future financial performance of the Company and the other matters covered thereby.

[DE 1 at 27, ¶131 (citations omitted)].

Plaintiffs allege that the statements would cause an investor to believe that the Company's future business plan only included organic growth. [*Id.* at 28, ¶132]. Plaintiffs also allege that the statements falsely represented the accuracy of the July 2017 Projections, which did not include projections based on acquisitions, because the Company represented that they relied solely on the July 2017 Projections in developing the fairness opinions. [DE 59 at 1254–55].[2] Plaintiffs argue that these statements are objectively false because the Company's actual growth plan at the time of the Merger included acquisitions and was supported by numerous statements made by the Company, including the Company's SEC filings. [*Id.* at 1255–60]. Plaintiffs also argue that the statements are subjectively false because the Individual Defendants knew that the Company's actual growth plan included acquisitions when they approved the statements inclusion in the Proxy. [*Id.* at 1260–66].

In response, Defendants argue that the Proxy statement was not false or misleading because the Proxy statement explicitly disclosed that acquisitional growth was one of three components of its growth strategy, and therefore no investors could reasonably believe that the company contemplated only organic growth. [DE 55 at 388–89]. Similarly, the Proxy did not represent that the July 2017 Projections were accurate because the Proxy explicitly disclaimed the accuracy of the Projections. [DE 60 at 1300]. Thus, the statements cited by Plaintiffs in the Complaint could not have amounted to a misstatement. [*Id.*]. The Court agrees.

---

[2] Defendants assert that the second alleged misstatement appears for the first time in Plaintiff's Opposition. For this Order, the Court will analyze both alleged misstatements as if properly alleged in the Complaint.

a. The Company only contemplated Organic Growth

The Board of Directors' endorsed the merger as being "more favorable to the Company's stockholders than the likely value that might result from other potential transactions or remaining a standalone company." [DE 59 at 1262–63]. Plaintiffs argue that the Board of Directors' endorsement gave the impression that the "Company's stand-alone acquisition plans were due to be abandoned, and that shareholders should not make their voting decision based on any notion that such plans would continue if the Merger was scuttled." [*Id.* at 1263]. Plaintiffs' argument is based on the fact that the UBS and BAML fairness opinions relied on the July 2017 Projections and representations that the July 2017 Projections were the "best currently available estimates." [*Id.*].

This might appear a reasonable inference if viewed in isolation—but that would be to ignore the rest of the Proxy. For example, the Proxy contains an express disclaimer that warns stockholders not to make assumptions—like the one described above—based on the Projections. [DE 55-2 at 461]. The disclaimer states that "specific portions of the Projections . . . should not be regarded as an indication that such Projections will be an accurate prediction of future events, and they should not be relied on as such." [*Id.*]. The Proxy also warns stockholders "not to place undue reliance on" the Projections and that no one "has made or makes any representation to any stockholder regarding the information included in the projections." [*Id.*]. Finally, the disclaimer states that the Projections or their assumptions may be "inaccurate." [*Id.*].

The Proxy also contains statements explicitly stating that future acquisition remains part of the Company's growth plans. For example, the Proxy incorporates the Company's SEC filings, which inform investors that pursuing acquisitions was one of three components of the Company's

business focus and growth plan. [DE 55 at 389]. Under the heading "Our Business Focus," the 10-K states:

> *Acquire Competitors.* We also intend to expand our market share through selected geographic expansion in markets not currently served by us and through strategic acquisitions in existing and underserved markets. The Corporation currently operates in 45 states. We believe that there are growth opportunities in several other markets. There are numerous businesses in our markets, mostly small or regional companies that lack the scale that we believe will be necessary to ultimately compete in a market that is national in scope. We intend to actively seek opportunities to acquire companies. Since its formation in 2006, the Corporation has acquired 23 institutional pharmacy businesses, six specialty infusion services businesses, one specialty oncology pharmacy and one hospital services business.

[DE 55-6, 2017 10-K at 781]. Even more explicitly, the 10-K states:

> We have made and anticipate that we may continue to make acquisitions of, investments in and strategic alliances with complementary businesses to enable us to capitalize on our position in the geographic markets in which we operate and to expand our business in new geographic markets. Our growth plans rely, in part, on the successful completion of future acquisitions.

[*Id.* at 808]. The language is clear—PharMerica's growth plan contemplates future acquisitions.

Based on the SEC disclosures and the disclaimer, the Court finds that no reasonable stockholder would construe the seven statements at issue to imply that PharMerica's growth plan only contemplated organic growth. In fact, the Proxy all but explicitly told the stockholder not to make such an inference.

This conclusion is supported by other federal courts. *See Laborers' Local #231 Pension Fund v. Cowan*, 300 F. Supp. 3d 597, 607–10 (D. Del. 2018); *OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*, No. 14-68-RGA, 2015 WL 4036179, at *6–7 (D. Del. July 1, 2015); *Laborers' Local #231 Pension Fund v. Cowan*, No. 17-478, 2018 WL 3468216, at *4 (D. Del. July 18, 2018). In *Laborers' Local #231 Pension Fund v. Cowan* the plaintiff brought a Section 14(a) claim against Lionbridge Technologies Inc. and its board of directors, among others. *Cowan*, 300 F. Supp. 3d at 603. The Plaintiff in *Cowan*, just like Plaintiffs here, claimed that financial forecasts in the

proxy statement issued by Lionbridge to its stockholders were misleading because those forecasts failed to accurately portray Lionbridge's acquisition strategy. *Id.* at 607. The *Cowan* proxy statement contained a disclaimer like the one here. The disclaimer stated, "[t]he inclusion of the selected elements of the forecasts in the table and accompanying narrative above should not be regarded as an indication that Lionbridge and/or any of our affiliates, officers, directors, advisors, or other representatives consider the forecasts to be predictive of actual future events, and this information should not be relied upon as such," and "[i]n light of the foregoing factors and the uncertainties inherent in the forecasts, Lionbridge stockholders are cautioned not to place undue, if any, reliance on the forecasts." *Id.* at 607. The *Cowan* court found that the proxy's disclaimer effectively prevented the financial forecasts from affirmatively misleading stockholders about Lionbridge's future actions, including potential future acquisitions. *See id.* at 606–08.

Ultimately, the implication that PharMerica's growth plan at the time of the merger only included organic growth requires the stockholder to assume that the July 2017 Projections are accurate indications of PharMerica's future actions and ignore the many other statements about the Company's future growth plans. Such an assumption is an unreasonable one when put in context. The disclaimer is long, extensive, and clear—the projections are not to be relied on as indicative of future events. Even if the disclaimer fails to dissuade the stockholder from inferring that PharMerica intends no future acquisitional growth, PharMerica's SEC filings and other public statements explicitly stating that the Company's plans included future acquisition would.

Simply put, nowhere does the Proxy affirmatively state that PharMerica's growth plan only contemplates organic growth. Nor is it implied. To the contrary, the Proxy expressly warns stockholders not to assume future events based on the Projections and states that PharMerica's growth plan indeed includes future acquisition. Thus, Plaintiffs' allegation that the seven Proxy

excerpts referring to the July 2017 Projections are affirmative misleading statements because they imply that PharMerica's growth plan at the time of the merger only contemplated organic growth lacks merit.

b. Statements in the Proxy Represent the Accuracy of the July 2017 Projections

Plaintiffs also claim that Defendants' statements in the Proxy representing the accuracy of the July 2017 Projections are materially false because the July 2017 Projections fail to include future acquisitions, even though PharMerica contemplated acquisitional growth. [DE 59 at 1255].

The allegation fails to state a Section 14(a) claim for two reasons. First, the July 2017 Projections are literally accurate. Second, the assumption that PharMerica would not make future acquisitions is immaterial under Section 14(a) because the Proxy unambiguously disclosed that assumption to the shareholders.

First, to the extent Plaintiffs claim that the July 2017 Projections are literally inaccurate because they exclude acquisitions, that allegation fails. If the July 2017 Projections had concealed from stockholders that they did not include acquisitions, then they might be inaccurate. But the July 2017 Projections on their face unambiguously disclose that assumption to stockholders. They are exactly what they claim to be—projections which exclude acquisitions. The claim that the July 2017 Projections, which on their face claim to exclude acquisitions, are inaccurate because they exclude acquisitions fails as illogical.

Second, Plaintiffs allege that Defendants represented the July 2017 Projections as "accurate," when they knew subjectively that they were not. Plaintiffs argument is based on the notion that the July 2017 Projections relied on an incorrect or false assumption—they should have assumed that PharMerica would continue to grow through acquisition, just like the 2015, 2016, and previous 2017 Projections had. As discussed above, PharMerica's growth plan contemplated

15

future acquisitions. As a result, the July 2017 Projections were indeed based on a poor assumption, but this is not actionable by itself.

First, courts routinely hold that assumptions and inputs in financial projections are not misstatements where those assumptions are accurately disclosed to stockholders by the Proxy. *See Trahan v. Interactive Intelligence Grp., Inc.*, 308 F. Supp. 3d 999, 995–96 (S.D. Ind. 2018) (compiling cases from several circuits, all of which holding that assumptions and inputs in financial analyses are immaterial when disclosed to stockholders and thus cannot support a Section 14(a) claim, which requires *material* misrepresentation). The assumptions and inputs in financial forecasts are immaterial, and therefore not misstatements under Section 14(a), when disclosed, because once disclosed the stockholder is free to determine for themselves whether such assumptions and inputs are appropriate. *See, e.g.*, *In re Plains Exploration & Prod. Co. Stockholder Litig.*, No. 8090-VCN, 2013 WL 1909124, at *9 (Del. Ch. May 9, 2013) ("Having been provided the rates used, stockholders can judge for themselves whether the discount rate was appropriate. . . . [Q]uibbles with a financial advisor's work cannot be the basis of a disclosure claim.") (quotations citations omitted).

Here, as discussed above at length, the July 2017 Projections reveal on their face that they assume no future acquisitional growth. While it seems that this assumption was indeed a poor one, shareholders had all the information necessary to draw that conclusion on their own. Thus, to the extent Plaintiffs allege that the July 2017 Projections are misleading based on their underlying assumption that PharMerica would make no future acquisitions, Plaintiffs fail to state a claim under Section 14(a).

Second, Plaintiffs have identified no statement that approximates the endorsements made in the cases they rely on. For example, in *Hot Topic*, the plaintiff alleged that defendant, Hot

Topic, created financial forecasts, but after starting merger negotiations, Hot Topic revised its financial forecasts, reducing projected revenue and growth, which were based on flawed and inaccurate assumptions. *In re Hot Topic Sec. Litig.*, 2014 WL 7499375, at *6. The plaintiffs alleged that Hot Topic required the fairness evaluators to rely only on the inaccurate financial projections and represented "the Revised Projections as 'better reflect[ing] what management believed the Company would be able to achieve during the next five years compared to the LRP Projections.'" *Id.* at *3. The court in denying the motion to dismiss, found the statement describing the revised projections as more accurate than the original projections to be potentially misleading, especially because the proxy omitted information regarding the revised projection. *Id.* at *8–10.

*Hot Topic* is not comparable here because the two proxy statements are not comparable. The *Hot Topic* proxy omitted details that might have helped the stockholder realize the relative inaccuracy of the revised financial forecasts. Here, Plaintiffs have identified no such details omitted by the Proxy about the July 2017 Projections. In fact, the July 2017 Projections make clear that they exclude acquisitional growth. More importantly, the *Hot Topic* proxy contained an affirmative statement which endorsed the revised forecasts as more accurate than the original forecasts. Here, the Proxy does include a statement that "UBS assumed, at the direction of the board, that they were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of PharMerica as to the future financial performance of PharMerica" [DE 1 at 27] and that "UBS assumed, with the approval of the board, that the financial forecasts and estimates referred to above will be achieved at the times and in the amounts projected." [*Id.*]. It also includes express language warning stockholders that none of the Projections' accuracy can be guaranteed, and that they should not rely on the projections to make

predictions about future events. [DE 55-2 at 461]. Thus, the Court finds *Hot Topic*'s holding inapplicable here.

*Precision Castparts* is similarly inapplicable. In *Precision Castparts*, after entering merger negotiations with Berkshire Hathaway Inc., Precision Castparts Corp. abandoned financial projections which displayed a scenario including potential acquisitions, as well as a scenario excluding potential acquisitions (May Forecasts). *NECA-IBEW Pension Tr. Fund (The Decatur Plan) v. Precision Castparts Corp.*, No. 3:16-cv-01756-YY, 2017 WL 4453561, at *6–7 (D. Or. Oct. 3, 2017). Precision Castparts replaced those projections with new ones that lacked a scenario in which potential acquisitions were considered. *Id.* The fairness opinion in the proxy statement issued by Precision Castparts to its stockholders relied solely on the revised projections, which excluded acquisitions. *Id.* at *4. Like Hot Topic, Precision Castparts affirmatively endorsed the revised projections as more accurate than the original projections. The proxy issued by Precision Castparts stated as follows: "The Board relied primarily on, and for purposes of its analyses and opinion directed Credit Suisse to use, the Company Forecasts rather than the May Forecasts, as the Company Forecasts reflected management's most up-to-date and accurate forecasts." *Id.* at *6. The proxy further stated that "the Company Forecasts did not assume any acquisitions other than those that were previously announced or completed because of the inherent uncertainty of consummating acquisitions with third parties on terms that would be attractive to the Company or at all." *Id.* In recommending that Precision Castparts' motion to dismiss the plaintiffs' Section 14(a) claims be denied, the Magistrate Judge found these statements endorsing the revised forecasts as "the most up-to-date and accurate" misleading and actionable under Section 14(a). *Id.* at *8–9.

Just like *Hot Topic*, *Precision Castparts* turns upon the fact that the proxy contained an affirmative statement endorsing the revised financial projections as more accurate than other financial projections. As already discussed, Plaintiffs here point to no comparable affirmative statement in the Proxy. In fact, as already explained, the Proxy contains language to the contrary, which warns stockholders that the projections might be inaccurate and not to unduly rely on them. [DE 55-2 at 461]. Thus, the Court finds *Precision Castparts* distinguishable from this case.

### 2. Material Omissions

Next, Plaintiffs allege that the Proxy violates Section 14(a) because it omits material information which renders statements in the Proxy misleading. [DE 59 at 1266]. Defendants counter that the allegedly omitted material is either in the Proxy or immaterial and the to the extent there are any omissions Plaintiffs fail to explain how the alleged omissions render any statements in the Proxy misleading.[3] [DE 55 at 394]. Plaintiffs respond arguing that their Complaint sufficiently alleges omissions actionable under the framework set by *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015). [DE 59 at 1266].

To begin, the Court notes that *Omnicare* involved a Section 11 claim and is therefore not directly applicable to this case, involving a Section 14(a) claim. Courts are split on whether to apply the *Omnicare* framework to Section 14(a) claims, and the Sixth Circuit has not done so.

---

[3] The Court also notes that Defendants argue the Complaint is a "puzzle pleading." [DE 55 at 394–95]. Puzzle pleading are complaints that lists various omissions and then separately lists statements in the Proxy which have been made misleading by those omissions, leaving the Court to solve the puzzle of which omission makes which proxy statement misleading and how exactly it does so. *See Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, No. 17-cv-05558-HSG, 2018 U.S. Dist. LEXIS 149393, at *15 (N.D. Cal. Aug. 31, 2018). While Plaintiffs' Complaint lists the alleged omissions separately from the Proxy statements those omissions allegedly make misleading, the Court believes that it can adequately decipher from the Complaint and Plaintiffs' response to the motion to dismiss which alleged omissions generally correspond to which proxy statements. The Complaint is no pinnacle of precision. But the Court need not dismiss a Complaint simply because it is difficult to understand. *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 2004 DNH 155P, at *26 (D.N.H. 2004). ("Although I am sympathetic to defendants' contention that the consolidated complaint is difficult to decipher, I do not agree that it is so poorly drafted that it violates the PSLRA."). The Plaintiffs' Complaint is precise enough not to warrant dismissal as a puzzle pleading.

*Compare, Golub v. Gigamon Inc.*, 372 F.Supp.3d 1033, 1049 (N.D. Cal. 2019) ("The Ninth Circuit has only extended *Omnicare* to Section 10(b) and Rule 10b-5 claims, not to Section 14 claims") *with Paradise Wire & Cable Defined Benefit Pension Plan v. Weil,* 918 F.3d 312, 318 (4th Cir. 2019) (applying *Omnicare* to 14(a) omission claim). Whether or not the Court applies the *Omnicare* framework is immaterial because Plaintiffs' claim fails *Omnicare*.

As discussed, to allege a material omission "the plain language of Rule 14a–9 requires a plaintiff to show both materiality and a false or misleading statement as a result of the omission." *IBEW Local 98 Pension Fund v. Cent. Vermont Pub. Serv. Corp.*, No. 11-CV-222, 2012 WL 928402, at *11 (D. Vt. Mar. 19, 2012). To show that an opinion was made false or misleading by an omission, Plaintiffs must show that the omitted information caused the opinion to be both subjectively and objectively false so that the opinion is wrong, and the defendant knew it to be so. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) (citing *Va. Bankshares*, 501 U.S. at 1093). The *Omnicare* framework provides a more lenient standard such that the plaintiff need not show that the maker of the opinion did not actually hold the stated belief but that a stockholder must "understand an opinion statement to convey facts about how the speaker has formed the opinion," and "the real facts are otherwise, *but not provided*." *Id.*, 135 S.Ct. at 1329 (emphasis added). In other words, defendant must have "omit[ted] material facts about the defendant's inquiry into or knowledge concerning [the] statement of opinion." *Id.* at 1328. Plaintiffs fail to meet either standard because they have failed to show that material information was omitted.

a. The Proxy Allegedly Omits PharMerica's Financial Projections Including Acquisitional Growth.

First, relying on *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, and comparing this case to *Laborers' Local #231 Pension Fund v. Cowan*, No. 17-478, 2018 WL 3243975 (D. Del. July 2, 2018), the Plaintiffs claim the Proxy omitted "the Company's financial

projections reflecting the acquisitions scenario and/or valuation information reflecting the Company's true growth plan including acquisitions" which made the Board of Director's statement that $29.25 merger price was fair misleading. [DE 1 at 31].

While the opinion that the merger price was fair fits into the *Omnicare* framework, there is no *Omnicare* omission here. A reasonable shareholder might understand the opinion that the $29.25 price was fair to convey that such an opinion was made based on financial valuations that considered PharMerica's intended acquisitional growth given the Company's many statements that it would continue future acquisition. But the fact that the July 2017 Projections did not include future acquisitions was disclosed in the Proxy. The Proxy informs stockholders that the Board, and the financial institutions in forming their opinions, relied on the July 2017 Projections, which excluded acquisitional growth. Thus, Plaintiffs failed to show that the Proxy omitted any material facts, which would make the opinion that the $29.25 price was fair misleading under Section 14(a), including that it "omit[ted] material facts about [the defendants'] inquiry into or knowledge concerning [the] statement of opinion," as required by *Omnicare*. *Id.* at 1329.

As there is no *Omnicare* omission here, this case is unlike *Laborers' Local #231 Pension Fund v. Cowan*, 2018 WL 3243975. After the Delaware District Court dismissed the plaintiff's original Complaint in *Laborers' Local #231 Pension Fund v. Cowan*, 300 F. Supp. 3d 597 (D. Del. 2018), it addressed the plaintiff's amended Complaint in *Laborers' Local #231 Pension Fund v. Cowan*, No. 17-478, 2018 WL 3243975 (D. Del. July 2, 2018) (*Cowan II*). In *Cowan II*, the Plaintiff's Amended Complaint alleged that Lionbridge's statement in the proxy identifying the financial advisor's fairness opinion as a "positive reason" supporting its completed decision to approve the merger was actionable pursuant to *Omnicare*. *Id.* at *1. The *Cowan II* court narrowly found that declaring the fairness opinion a "positive reason" for completing the merger could have

led stockholders to assume the fairness opinion was accurate and that it considered future acquisitions, and the Proxy "**omitted** the fact the projections did not incorporate acquisition based growth." *Cowan*, 2018 WL 3243975 , at \*10–11. (emphasis added). Here, investors were explicitly told that the financial projections did not include acquisitions. As no facts were omitted, this case inapposite to *Cowan II*.

Furthermore, given that the July 2017 Projections disclosed that they did not assume a scenario projecting future acquisitions, as the earlier projections had, the fact that they omitted such a scenario is immaterial for a Section 14(a) claim. As discussed above, assumptions included or excluded from financial forecasts—so long as they are disclosed—are not material. *See Trahan*, 308 F. Supp. 3d at 995–96.

Ultimately, the heart of Plaintiffs' claim—is that the July 2017 Projections should have included acquisitions, just like other financial projections in the Proxy. Maybe this is true, but the Proxy provided shareholders all they needed to understand the circumstances and basis for the opinions of Board and the financial institutions. Thus, there is no *Omnicare* omission here, and whether a wise assumption or not, the fact that future acquisitions were omitted from the July 2017 Projections is immaterial because that assumption was disclosed to shareholders. Section 14(a) is not a vehicle by which plaintiffs may drive their fiduciary claims into federal court. *Maldonado v. Flynn*, 597 F.2d 789, 796 (2d Cir. 1979). The Proxy discloses to stockholders that PharMerica's growth plan contemplated future acquisition, that the July 2017 Projections excluded acquisitions, and that the Board and its financial advisors in forming their fairness opinions relied on the July 2017 Projections. Thus, Defendants have made no material misrepresentation or omissions by failing to include acquisition-based growth in the July 2017 Projections.

b. The Proxy Allegedly Omits Statements Informing Stockholders the Fairness Opinions Were Based on Projections That Ignored a Critical Growth Plan and Expectations of PharMerica.

Next, the Complaint alleges that the Proxy omits "statements clearly informing stockholders that the [BAML and UBS] valuation was performed on projections that ignored a critical growth plan and expectations of the Company." [DE 1 at 32]. In other words, the Proxy failed to inform stockholders that the fairness opinions were based on financial projections which excluded acquisitions. Defendants respond that the Proxy in fact contains this information. [DE 55 at 391–92]. The Court agrees.

The Proxy contains statements that explain to the stockholder that PharMerica's future growth plan includes acquisitional growth. [DE 55-6, 2017 10-K at 781, 808]. The Proxy also explains to stockholders that the July 2017 Projections excluded future acquisitions. [DE 55-2 at 463]. Finally, the Proxy explains to stockholders that the fairness opinions relied on the July 2017 Projections. [*Id.* at 461, 463]. As a result, these allegations fail to state a Section 14(a) claim. *See Washtenaw Cty. Emples. Ret. Sys. v. Wells Real Estate Inv. Tr., Inc.*, No. 1:07-CV-862-CAP, 2008 WL 2302679, at *4 (N.D. Ga. Mar. 31, 2008) ("First, the court notes that many of the facts that the plaintiff alleges were omitted from the Proxy were actually contained in the Proxy. In these instances, there can be no § 14(a) violation.").

c. The Proxy Allegedly Omits Information Regarding Conflicts of Interest.

Finally, in their Complaint the Plaintiffs allege that the Proxy omits "statements clearly informing stockholders the who/what/when/where of compensation discussions between management and KKR and/or [Walgreens]" and "statements clearly informing stockholders when the Board was informed of which specific components of the UBS' and [BAML's] relationships with KKR and/or [Walgreens]." [DE 1 at 32]. The Complaint identifies these omissions as

material because stockholders "would want to know" the information. [*Id.*]. Defendants argue that the Proxy made extensive disclosures about potential conflicts and that the Plaintiffs' claiming that the stockholders "would want to know" the exact details omitted does not adequately explain why those omitted details are material to stockholders. [DE 55 at 392]. Rather than expand on why this information might be material to stockholders, the Plaintiffs reply by listing all the potential conflicts of interest disclosed by the Proxy and repeat their original allegation that the Proxy omits "facts disclosing the timing and content of management compensation discussions and banker conflicts." [DE 59 at 1272].

To satisfy the PLSRA's pleading standard, the Plaintiff must explain how the alleged omissions are material. *Goldfinger v. Journal Communs., Inc.*, No. 15-C-12, 2015 WL 2189752, at *3 (E.D. Wis. May 8, 2015). A lack of specific detail, particularly given what otherwise appears to be a thorough explanation, is not material. *See In re Delphi Fin. Grp. S'holder Litig.*, 2012 WL 729232, at *18 (Ch. Mar. 6, 2012); *Goldfinger*, 2015 WL 2189752, at *5. Such specifics are not material "simply because [they] may be relevant or of interest to a reasonable shareholder." *IBEW Local 98 Pension Fund*, 2012 WL 928402, at *9 (quotations and citations omitted).

Here, the Plaintiffs have failed to explain how the alleged omissions rise to anything more than allegations that the Proxy lacked immaterial specific details about already thorough disclosures. The Proxy clearly states that some of PharMerica's executive officers have discussed retention agreements and potential post-merger employment. [DE 55-2 at 472]. The proxy also details the relationship between all the companies involved in the merger and the financial advisors, and states that those relationships were disclosed to the Board before its vote on the merger. [*Id.* at 454, 459–60]. Given these already thorough disclosures, Plaintiffs' claims amount

to a mere alleged lack of specific details, none of which are material. Thus, the Court finds the Plaintiffs have failed to allege an actionable omission under Section 14(a).

As the Plaintiffs' Complaint fails to adequately allege that the Proxy contains a material misrepresentation or omission, the Section 14(a) claims against Defendants must be dismissed.

*3. Scienter and Loss Causation*

Because the Court has already determined the Plaintiffs failed to plead a material omission or misleading statement actionable under Section 14(a), it need not address whether the Plaintiffs' Section 14(a) claims should also be dismissed for the failure to allege scienter[4] or loss causation.

B. Plaintiffs' Section 20(a) Claim

Section 20(a) of the Securities Exchange Act extends liability to "[e]very person who, directly or indirectly, controls any person liable under any provision" of the Exchange Act, jointly and severally with the person controlled. 15 U.S.C. § 78t(a). Because, as explained above, there is no underlying violation of the Exchange Act, the Plaintiffs' Section 20(a) claims must be dismissed along with the underlying Section 14(a) claims. *See Kugelman v. PVF Capital Corp.*, 972 F. Supp. 2d 993, 1000 (S.D. Ohio 2013).

IV.    **CONCLUSION**

For the reasons stated above, and being otherwise sufficiently advised, the **COURT ORDERS AS FOLLOWS:**

(1) Defendants, PharMerica Corporation's and Kohlberg Kravis Roberts & Co. L.P.'s motion to dismiss [DE 55] is **GRANTED.**

---

[4] That said, the Court notes it has read and considered *Bluestone v. Sadove*, No. 3:18-cv-63, 2019 U.S. Dist. LEXIS 62207 (E.D. Tenn. Mar. 14, 2019) and other relevant cases, but it does not read *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422 (6th Cir. 1980) to require scienter outside of accountants. The Court has found no other binding authority in the Sixth Circuit requiring a Section 14(a) claim to plead scienter.

(2) Defendants, Frank E. Collins's, W. Robert Dahl's, Jr, Marjorie W. Dorr's, Patrick G. Lepore's, Geoffrey G. Meyers's, Robert A. Oakley's, Gregory S. Weishar's motion to dismiss [DE 56] is **GRANTED**.

The Court will enter a separate Judgment consistent with this Memorandum Opinion & Order.

**IT IS SO ORDERED.**

Rebecca Grady Jennings, District Judge
United States District Court

September 23, 2019